YAP

AO 91 (REV.5/85) Criminal Complaint

AUSA Barry Jonas (312) 886-8027
AUSA Paul Tzur (312) 697-4032

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
6-30-2011
JUN 30 2011
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

MAGISTRATE JUDGE MASON

UNITED STATES OF AMERICA

v.

CHUNLAI YANG

CRIMINAL COMPLAINT

CASE NUMBER:

**UNDER SEAL** 11 CR 0458

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: On or about July 19, 2010, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, CHUNLAI YANG defendant herein:

> Whoever, with intent to convert a trade secret, that is related to or included in a product that is produced for or placed in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending that the offense will injury any owner of that trade secret...without proper authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information.

in violation of Title 18, United States Code, Section 1832. I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Joanne L. Cullinan
Signature of Complainant
JOANNE L. CULLINAN
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

June 30, 2011 at Chicago, Illinois
Date City and State

MICHAEL T. MASON, U.S. Magistrate Judge
Name & Title of Judicial Officer

Michael T. Mason
Signature of Judicial Officer

UNITED STATES DISTRICT COURT )
) SS
NORTHERN DISTRICT OF ILLINOIS )

AFFIDAVIT

I, JOANNE L. CULLINAN, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation, and have been so employed for 14 years. My current responsibilities include the investigation of Counter intelligence.

2. This affidavit is submitted in support of a criminal complaint alleging that Chunlai YANG has violated Title 18, United States Code, Section 1832. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging YANG with theft of trade secrets, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3. This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents and by employees of Company A, further described below.

4. Company A, located in Chicago, IL, is a trading exchange company. Company A brings buyers and sellers together through an electronic trading platform and open outcry trading facilities. Company A also operates a central counter party clearing service that provides clearing and settlement services for exchange-traded contracts, as well as for cleared over-the-counter

derivatives transactions. Company A also offers a wide range of market data services, including live quotes, delayed quotes, market reports, and historical data services.

***Company A's Computer Programs***

4. According to information provided to me by Company A employees, Company A created computer software programs to conduct and protect its trading business. Company A created an electronic trading platform which allows market participants to buy and sell from anyplace at anytime. As part of the electronic platform, Company A created multiple computer programs to run the trading platform including a trading engine to support its futures market, a program designed to provide pre-trade execution risk controls that enable clearing firms risk administrators to set credit limits, a program that allows traders to access historical price information, a trading application operated from a hand held device used by floor traders to execute trades, a program which allows traders to integrate Company A market data into trading applications, and a program which served as the gateway into the trading platform.

5. According to Company A employees, Company A customers located throughout the United States and overseas conduct the majority of the trades they make through Company A, on the electronic trading platform. The electronic trading platform was created by Company A for its own use and is not available publically. The electronic trading platform is utilized by traders and other third parties, but the source code and algorithms that make up the supporting programs discussed above are proprietary confidential business property which are trade secrets of Company A. YANG downloaded a large amount of the software and source code that makes up these computer programs.

6. Company A employees have informed me that these programs and source codes are central to Company A's function and are housed within a software program called ClearCase, that

provides additional security for the programs over and above Company A's normal computer security protections.[1] Company A restricts access to this software to only employees with certain job credentials who have a need to have access in order to perform their employment functions.[2] In order to access the software, an employee must, in addition to a standard log on procedure to their computer which requires entering a user identification and a password, enter a secure area on Company A's server through an additional log on process which requires an employee specific password (which is the same password needed to log on to the computer). Company A requires their employees to change their passwords every 90 days.

7. When all Company A employees log onto their computer, a warning message appears. Company A has provided me with a snap shot of a computer screen with the warning message. It states "This system is to be used for authorized Company A business purposes only. Any unauthorized access or activity is a violation of Company A policy and may be a violation of law. All activity on this system is subject to monitoring in case of possible security violations."

8. The programs and trading platforms discussed in paragraph 4 above, all contain computer source code that are classified by Company A as confidential. If the source code were to be released to competitors, clients or anyone else in the financial industry, it could cause great economic damage to Company A. The information could be used to establish a competing business which could cause the loss of clients.

---

[1]ClearCase is a software developed and sold by IBM that allows uses to simultaneously work on a document. A side benefit of ClearCase is that it adds an additional layer of protection to the documents.

[2]Company A estimates that about one third of its employees have access to the programs contained within ClearCase.

***Company A Employee's Code of Conduct***

9. According to Company A employees, Company A requires each employee to review annually Company A code of conduct and employee handbook. The code of conduct informs employees that it possesses, and employees may have access to, confidential and sensitive information, including technological information regarding Company A's systems. The code of conduct also instructs employees to follow all company policies and procedures relating to the protection of confidential information. The employee handbook provides further guidance on the use and dissemination of Company A's electronic information. According to the handbook, electronic information to which employees have access is the property of Company A and is provided for Company A business purposes only. The handbook also warns that employees who have access to confidential information, such as trade secrets, must take responsibility for safeguarding that information. The handbook also directs employees to review Company A's systems use policies.

10. One such policy, the Information Security Acceptable Use Policy, informs employees that all Company A information, including internal documents, policies, corporate strategies, and trade secrets, should be considered confidential. This policy strictly prohibits employees from: (i) violating Company A's copyright, trade secret, patent, or other intellectual property rights; (ii) exporting software, technical information, encryption software, or technology; (iii) and engaging in security breaches by, among other ways, accessing data of which Company A employees are not intended recipient or accessing server data, unless doing so is within the scope of the employee's regular duties.

11. Another policy, the Data Classification Policy, instructs employees on how to manage Company A's confidential and highly sensitive information. This policy explicitly states that

employees who receive confidential or highly sensitive information should not distribute such information within the company without first determining whether the recipient has a need to know the information being transferred. The policy further states that employees are prohibited from disseminating confidential or highly sensitive information outside of the company without first obtaining a written confidentiality agreement from the intended recipient of the information, and should disseminate such information without the knowledge and approval of the author or Company A employee responsible for the information.

***Chunlai YANG***

12. Chunlai YANG ("YANG"), age 49, a naturalized United States citizen and a Chinese national, received a BS and a MS in from Peking University in Beijing, China, and a Ph.D. in Physics in the United States. He has worked at Company A since 2000 and is currently a senior software engineer in the Technoloy & Enterprise Computing Division, in the Front Ends Systems Technology Department. YANG's responsibilities include writing computer code. YANG works in his own cubicle at Company A and has a computer that is used by him. YANG's position allows him access to the software programs housed within ClearCase, although YANG does not have a need to access the software programs discussed in paragraph 4 above.

13. I have been provided by Company A receipt and acknowledgment forms signed by YANG which states that he has complied with Company A policies discussed above, and that he is aware of his responsibilities to report violations of law, regulatory obligations and code of conduct.

***Downloaded Documents***

14. In or around May 2011, Company A security personal began monitoring YANG's computer and discovered that YANG, downloaded thousands of files of source code and algorithms

protected by ClearCase, and created and used exclusively by Company A to conduct its business, from Company A's server to the hard drive on his Company A computer, and then downloaded at least some of these files from his Company A computer to multiple external devices, commonly referred to as "flash drives" or "thumb drives." Some of the downloaded material are trade secrets which YANG has no need to access to fulfill his job functions.

15. On May 12, 2011, and June 28, 2011, Company A created a mirror image of YANG's Company A computer hard drive. On June 28, 2011, Company A provided me the hard drive from YANG's computer. I turned over the hard drive to the FBI who has made a mirrored image of the computer. I have reviewed specific folders identified by Company A as containing Clear Code protected information. On June 30, 2011, Company A provided me with snapshots/pictures of YANG's computer screen which came from a security program Company A installed on YANG's computer on or about May 26, 2011.

16. I have reviewed specific folders on YANG's computer from the May 12, 2011, mirror image of his hard drive and I have reviewed the June 28, 2011, mirror image of his hard drive. I specifically focused on certain folders contained on the hard drive which Company A has stated contain software and source code that run the programs discussed in paragraph 4 above, that are protected by Clear Code, are critical to Company A's functions and are considered proprietary and trade secret by Company A. Company A has also provided me with snapshots of YANG's computer screen which show that these specific folders were transferred to an external removable drive.

17. More specifically:

a. I have reviewed the June 28 mirror image of YANG's hard drive and have seen that Folder A is on his hard drive and I have reviewed same. Folder A contains multiple

subfolders, including subfolders that I have seen the contents of, which contain confidential source computer code which support the electronic trading platform, and which Company A employees have informed me that Company A considers to be trade secrets.

b. I have reviewed a snap shot of YANG's computer screen which was taken on June 22, 2011 at approximately 10:30 a.m., which shows an image of YANG's C drive directory with Folder A highlighted, a dialog box showing a transfer of a file in progress, and an image of the E drive directory with a folder marked as Folder A. This indicates that Folder A was being copied from YANG's hard drive onto the E drive of YANG's computer, which the screen shot identified as a removal drive. Company A has confirmed that the E drive is an external removable drive.

c. According to Company A employees, YANG's computer information shows that an external device, was plugged into YANG's E drive on June 22, 2011 date at around 10:30 a.m..

18. Furthermore:

a. I have reviewed the May 12 mirror image of YANG's hard drive and have seen that Folder B is on his hard drive and I have reviewed same. Folder B contains multiple subfolders, including subfolders that I have seen the contents of, which contain confidential source computer code which support the electronic trading platform, and which Company A employees have informed me that Company A considers to be trade secrets

b. I have reviewed a snap shot of YANG's computer screen which was taken on June 27, 2011, at approximately 2:47 p.m., which shows an image of YANG's E drive directory with Folder B and some of the subfolders contained within Folder B. The screen image of the E drive directory is not full screen so not all subfolders are shown, including the sensitive subfolders. I have

compared the screen shot of the E drive with the May 12, 2011, image of YANG's C drive. The subfolders that appear on the E drive screen shot appear to be identical to folders under Folder B on the C drive. This indicates to me that Folder B had been copied from YANG's hard drive onto the E drive of YANG's computer. Company A has confirmed that the E drive is an external removable drive.

c. I have reviewed the June 28 mirror image of YANG's hard drive and Folder B is no longer on the hard drive.

19. According to the Chief Information Officer, although YANG did have access to these files on the Company A server, he did not need to access them for his job performance.

***E-Mails***

20. According to Company A employees, YANG has a Company A e-mail account address of Chunlai.YANG@Company Agroup.com. Company A has provided me with copies of e-mails between YANG and Individuals A and B, that were taken from YANG's Company A e-mail account. I have reviewed those e-mails and the results of my review are below.

21. An e-mail dated July 19, 2010, containing a mixture of English and Chinese, is a chain conversation regarding what appears to be a social visit from an individual who is the assistant director of the Logistics and Trade Bureau for the Zhangjiagang Free Trade Zone, and who is the initiator of the e-mail chain. The last e-mail in the chain is a reply from YANG and is sent to Individuals A and B. Attached to the YANG reply e-mail is a document which, the CIO of Company A has informed me, is a document Company A considers to be a trade secret. This is a Company A document that contains protected source code information that is proprietary to Company A and is a trade secret.

22. On October 7, 2010, an e-mail was sent from Individual C to YANG and Individuals A and B. Attached to the e-mail is a document that is in English and Chinese, and appears to be incorporation papers for an entity entitled "East China Technology Innovation Park Co., Limited." The document identifies YANG and Individuals A and B as the sole directors and shareholders. According to the papers, Individual B possesses an American passport but lives in Jiangsu, China. The registered address of the company is in Wanchai, Hong Kong, China.

23. Company A has also provided me with an e-mail dated May 31, 2011, from Individual A to YANG's personal e-mail account and to Individual B. YANG forwarded the e-mail to his Company A e-mail account. The e-mail discussed the investment requirements and lists out the monetary investment each of the three will be required to make, in two installments. The amounts for each are different and are proportionality consistent with the amount of shares each individual holds in the East China Technology Innovation Park company, per the incorporation papers (Individual A is the largest shareholder, followed by Individual B and YANG). YANG's required investment in the company totals $118,182. The e-mail says the first investment should be transferred to a bank account with HSBC Holdings plc ("HSBC") by May 20 and the second investment should be transferred by June 1.

24. On June 3, 2011, YANG forwarded an e-mail chain from his personal e-mail account to his Company A e-mail account that originates from Individual C. The initial e-mail is in Chinese and is sent to YANG, and Individuals A and B. Individual A responds in English, asking for the swift code for HSBC. Attached to the e-mails is a document in English and Chinese that is on HSBC letterhead. The document says "Company Name: East China Technology Innovation Park Co.,

Ltd."and has account number XXX-XXXXXX-838. It identifies a Swift code for wire transfers and the branch address as Hong Kong.

25. Company A has provided a document found on YANG's hard drive that appears to have been created by Individual A and is written in Chinese. A FBI translator has provided me with a summary translation of the document. The document appears to be a business proposal and is addressed to the director of the economy, science and technology department at the office of overseas Chinese affairs of state counsel, asking the director to send a referral letter to the city of Zhangjiagang in support of YANG and Individual A's proposed company, East China Technology Innovation Park Co., Ltd. The document proposes a way to effectively increase trading volume at the Zhangjiagang chemical electronic trading market. One objective is to build a leading futures exchange and an electronic trading software support maker in China and profit from the sales of the software. The document also proposes building a Transamerica futures exchange software technologies company and making it a transfer station of the world's most advanced technologies to China. The document proposes that YANG will be the lead technical person of this company.

***Travel***

26. On June 27, 2011, YANG sent an e-mail to Individuals A and B, which states that he will be traveling to Shanghai, Pudong, on July 8, 2011. Company A has informed me that YANG has put in a request to take vacation days from July 7, 2011 until July 16, 2011. I have verified through Customs and Boarder Patrol, and through United Airlines, that YANG has flight reservations to travel from Chicago, O'Hare Airport to China on July 7, 2011 on United Airlines flight 825. I have not been able to verify YANG's return flight.

27. Based on the information above, there is probable cause to believe that YANG attempted to and did, with intent to convert a trade secret, that is related to or included in a product that is produced for or placed in interstate or foreign commerce, without proper authorization, knowingly copied, duplicated, sketched, draws, photographed, downloaded, uploaded, altered, destroyed, photocopied, replicated, transmitted, delivered, sent, mailed, communicated, or conveyed such information, for the economic benefit of anyone other than the owner of the trade secret, intending or knowing that the offense will injure any owner of that trade secret in violation of Title 18, United States Code, Section 1832.

.FURTHER AFFIANT SAYETH NOT.

Joanne L. Cullinan

JOANNE L. ~~CALDWELL~~ Cullinan
Special Agent, FBI

Subscribed and sworn
before me this 30th day of June, 2011

Michael T. Mason

MICHAEL T. MASON
United States Magistrate Judge